UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                        |
JAMES W. KING,                          |        Case No. 1:08-cv-1006
                                        |
        Plaintiff,                      |
                                        |
            v.                          |        HONORABLE PAUL L. MALONEY
                                        |
TRITON INDUSTRIES, INC.,                |
                                        |
        Defendant.                      |
                                        |
_____


## OPINION AND ORDER

**Granting the Defendant's Motion for Summary Judgment;
Referring Determination of Michigan SRCA Attorney Fees to Magistrate Judge**


        This is a diversity breach-of-contract action.  Plaintiff James W. King ("King"), a Georgia

citizen, is an independent sales representative ("ISR") representing principals to the boat industry

in the southeastern United States.  *See* Amended Complaint filed November 13, 2009 ("Am Comp")

¶¶ 1 and 5 and Ans ¶ 5.  Defendant Triton Industries, Inc. ("Triton"), a Michigan corporation with

its principal place of business in Lansing, Michigan, *see* Am Comp ¶ 2, has been manufacturing and

selling pontoon boats to dealers throughout the United States of America for about 24 years, *see*

Defendant's Motion for Summary Judgment filed August 5, 2009 ("MSJ"), Exhibit ("Ex") B,

Affidavit of Steven Scott Van Wagenen sworn August 4, 2009 ("Van Wagenen Aff") ¶¶ 3-4.  Triton

states that it has a practice of not entering into written agreements with its ISRs, *see* MSJ Ex C,

Deposition of former Triton Sales Manager Michael Siefker taken June 22, 2009 ("Siefker Dep")

at 12, instead using oral agreements to establish each ISR's geographical territory and commission schedule, *see* MSJ Ex B, Van Wagenen Aff ¶ 5. Triton's interpretation of its customary ISR commission policy and practice is as follows:

> An ISR's entitlement to a commission accrues when a boat order is shipped and Triton receives payment from a dealer. [Ex B, Van Wagenen Aff ¶¶ 6-7, and Ex D, Deposition of Steven Scott Van Wagenen taken February 10, 2009 ("Van Wagenen Dep") at 6 and 8] Thus, a significant period of time could elapse before a new ISR accrues the right to a commission based upon his or her efforts.

> In order to assist new ISRs financially, Triton pays them commissions which accrue on orders that were in process prior to the ISR's affiliation with Triton. [Ex B, Van Wagenen Aff ¶ 15] These would be sales which were initially begun by the predecessor to the ISR in the territory.

> In turn, when the relationship with the ISR terminates, Triton does not pay the ISR commissions on sales which have not yet accrued at the time of termination (the "Triton Commission Policy"). [Ex B, Van Wagenen Aff ¶¶ 7, 13, 15-16, and Ex D, Van Wagenen Dep at 35 and 37.]

MSJ at 2-3 (paragraph breaks added).

In May 2004, King and Triton entered into an oral agreement wherein he would be Triton's exclusive sales representative to boat dealers in the States of Alabama, Georgia, North Carolina, South Carolina, Tennessee, and Georgia, using his best efforts to solicit new dealer accounts (and new orders from existing dealer accounts) for the sale of new pontoon boats, boat parts, and accessories ("the agreement"). *See* Am Comp ¶ 6; Ans ¶ 6; MSJ Ex E, Deposition of James W. King taken May 14, 2009 ("King Dep") at 17. The agreement was negotiated by King, then-Sales Manager Michael Siefker, and Chief Executive Officer ("CEO") Steven Scott Van Wagenen. *See* MSJ Ex B (Van Wagenen Aff) ¶ 8. The parties agree that they never executed a written agreement. *See* Ans ¶ 5.

According to King, Triton expressly and/or impliedly agreed to pay him a commission for all sales made to accounts in his geographical territory *with respect to all orders it received before the termination of the agreement*.  *See* Am Comp ¶ 7.  Triton, however, maintains that the oral agreement obligated it to pay only "commissions for pending orders that were placed in his exclusive territory *prior to him becoming a sales representative with Triton*."  *See* Ans ¶ 7 (emphasis added).  Triton also maintains that the parties orally agreed that, upon King's termination, he "would *not* receive commissions for orders placed by him before his termination which were completed (i.e., the sales invoice was paid) after his termination."  Ans ¶ 7 (emphasis added).

For whatever orders were covered by the parties' oral agreement, King alleges, Triton agreed to pay a 5% commission on pontoon-boat sales and a $50 commission for each outboard-motor sale.  *See* Am Comp ¶ 7.  At some unspecified later time, the parties orally revised their oral agreement: King's commissions dropped to 3% on Aurora pontoon boats but remained 5% on all other pontoon boats (such as the Manitou model).  His flat $50 commission for each outboard motor remained the same.  *See* Am Comp ¶ 7 and MSJ Ex E (King Dep) at 23.[1]

At all times, King alleges, the parties' oral agreement called for a commission of only 2% on "initial sales to four inherited accounts in Plaintiff's territory until such time as Plaintiff established four new accounts, at which time the commission rate on the inherited accounts would revert to the normal commission rates."  Am Comp ¶ 7.  King admits that Triton paid him such commissions on pontoon-boat sales for four established dealers in his Territory for orders that were placed and filled before he began representing Triton.  *See* MSJ Ex E (King Dep) at 17.

---

[1]

The parties agree that Triton did not pay or promise to pay commissions on freight charges. *See* MSJ Ex D (Van Wagenen Dep) at 28-29 and Ex E (King Dep) at 19.

Triton CEO Van Wagenen testified that the aforementioned Triton Commission Policy, which did not provide for commissions for orders placed or filled after an ISR's termination, was part of the company's oral agreement with King. *See* MSJ Ex D (Van Wagenen Dep) at 35. By contrast, King testified to his belief that he is entitled to commissions for boats "ordered" at the August 2006 dealer meeting even if the boats in question were never ultimately manufactured or were never ultimately purchased and paid for by a dealer. *See* MSJ Ex E (King Dep) at 35.

On September 26, 2007, about sixteen months after the parties entered into the agreement, Triton terminated it. *See* Am Comp ¶ 8 and Ans ¶ 8. King filed the complaint in August 2008 in the United States District Court for the Eastern District of Michigan. He asserts three claims against Triton under Michigan law. Count one claims breach of contract, *see* Am Comp ¶¶ 4-10). Count two claims violation of Michigan's common-law Procuring-Cause Doctrine, which requires payment of commissions on sales for which the plaintiff was the procuring cause, without regard to whether the order was received before the termination of a sales-representation agreement, *see* Am Comp ¶¶ 11-15. Count three claims that Triton intentionally failed to pay sales commissions within the time prescribed by the Michigan Sales Representatives Commission Act, MICH. COMP. LAWS § 600.2961 ("SRCA"), *see* Am Comp ¶¶ 16-20. King seeks the following recovery:

- $62,909.16 in commissions on orders which he allegedly made while working as Triton's representative, but which were not finalized, confirmed, and/or paid for until after the termination ("the post-termination period"), with invoice dates ranging from October 2, 2006 through April 17, 2007
- Penalty damages equal to double the amount of the unpaid commissions, or $100,000, whichever is less, under the SRCA, MICH. COMP. LAWS § 600.2961(6)
- Attorneys fees under the SRCA
- Prejudgment interest under Michigan law
- Postjudgment interest under 28 U.S.C. § 1961

Plaintiff's Amended Computation of Damages Pursuant to FED. R. CIV. P. 26(a)(1)(A)(iii) dated

November 13, 2009 ("P's Damages") (Doc. No. 44) and Ex. A.[2]  King's amended complaint and amended damages computation no longer seek recovery for any allegedly-unpaid pre-termination commissions.  *See* Doc. Nos. 43 and 44.[3]

On October 27, 2008, pursuant to a joint stipulation of the parties, the Honorable Sean F. Cox, United States District Judge, transferred the case to this district, and Triton filed an answer and affirmative defenses the next day.  *See* Docs. 1, 4 and 5.  The parties agree that they are citizens of

---

[2]

"When a federal court enters a judgment for monetary damages on a state-law claim, 'federal law controls post-judgment interest but state law governs awards of prejudgment interest.'"  *Pinika, LLC v. MetLife,* – F. Supp.2d –, –, 2009 WL 2713262, *12 (W.D. Mich. Aug. 24, 2009) (Paul L. Maloney, C.J.) (citing *Estate of Riddle v. So. Farm Bur. Life Ins. Co.*, 421 F.3d 400, 409 (6th Cir. 2005)).  This rule applies even when the judgment involves no damages on a federal-law claim.  *See Pinika*, 2009 WL 2713262 at *12 (citing *Chouinard v. KinderCare Learning Ctrs., Inc.*, 2008 WL 913322, *3 (M.D. Tenn. Mar. 31, 2008)).

The federal post-judgment interest statute provides, in pertinent part,

Interest *shall* be allowed on any money judgment in a civil case recovered in a district court.  * * *  Such interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors for the Federal Reserve System, for the calendar week preceding the date of judgment.

28 U.S.C. § 1961(a) (emphasis added).  As the word "shall" suggests, post-judgment interest under this statute is mandatory.  *See Pinika*, 2009 WL 2713262 at *12 (citing *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir. 2002)).

"Interest shall be computed daily to the date of payment except as provided in [28 U.S.C. § 2516(b)] and [31 U.S.C. § 1304(b)], and shall be compounded annually."  28 U.S.C. § 1961(b).  For daily interest rates, the parties are referred to http://www.federalreserve.gov/releases/h15 ("Federal Reserve Statistical Release, H. 15 Selected Interest Rates (Weekly)."

Finally, post-judgment interest is calculated not only on compensatory damages, but on the sum of those damages plus prejudgment interest.  *See Pinika*, 2009 WL 2713262 at *12 (citing *City of Owensboro v. Ky. Utils. Co.*, 2009 WL 424996, *1 (W.D. Ky. Feb. 19, 2009) (McKinley, J.)).

[3]

Accordingly, the court need not consider MSJ at 9-11.

different States, *see* Am Comp ¶¶ 1-2 and Ans ¶¶ 1-2, and King plausibly states that more than $75,000 is at stake exclusive of interest, attorneys' fees, and costs. Accordingly, the court has uncontested diversity jurisdiction pursuant to 28 U.S.C. § 1332, as discussed briefly below.

After the parties completed discovery and engaged in unsuccessful settlement discussions, Triton filed a motion for summary judgment on August 5, 2009. Triton contends that it paid King all the commissions he was owed during the pre-termination period, and that he has neither contractual nor other legal entitlement to commissions for sales that were not paid-for until after the termination (the post-termination period).

King filed an opposition brief on September 1, 2009 and Triton filed a reply brief on September 15, 2009. *See* Doc. Nos. 35 and 37. By order issued October 22, 2009, the court directed King to file an amended complaint and an amended damages calculation consistent with his deposition testimony and his opposition brief. *See* Doc. No. 38. King did so on November 14, 2009. *See* Doc. Nos. 43 and 44. Triton has not yet filed an answer to the amended complaint. The court has treated Triton's motion for summary judgment as directed against the amended complaint.

The court heard oral argument on Monday, November 30, 2009. For the reasons that follow, the court will grant Triton's motion for summary judgment.

**DIVERSITY JURISDICTION**

Title 28 U.S.C. § 1332(a)(1) provides that federal district courts have original jurisdiction over all civil actions between citizens of different States "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs . . . ." Here, King seeks less than $75,000 in allegedly-unpaid post-termination commissions, plus penalty damages equal to double

the amount of the unpaid commissions, or $100,000, whichever is less, under the Michigan Sales Representative Commission Act. Accordingly, King cannot meet his burden of establishing diversity jurisdiction unless he shows that such an SRCA penalty may be counted when determining the amount in controversy. King has not attempted to argue this point, and the court finds no precedent precisely addressing the issue under this Michigan statute.

Nonetheless, the court finds that King satisfies the amount-in-controversy requirement. Our Circuit has stated that "[a]s a general rule," the section 1332 amount-in-controversy analysis "must also take into account" the plaintiff's ability to recover punitive damages, unless it is apparent to a legal certainty that such cannot be recovered. *See Smith v. Nationwide Prop. & Cas. Ins. Co.*, 505 F.3d 401, 408 (6th Cir. 2007) (citing *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 572 (6th Cir. 2001) (citation to 11th Cir. omitted)), *reh'g denied* (6th Cir. Nov. 2, 2007). *See, e.g., Mitchell v. Ainbinder*, 214 F. App'x 565, 566-67 (6th Cir. 2007) (Clay, Sutton, N.D. Ind. D.J. Allen Sharp) (in customers' action to vacate arbitration award in favor of brokerage firm and account executive on claims for violation of federal and state securities laws, punitive damages sought put amount in controversy "over the top" for purposes of federal diversity jurisdiction) (citing *Klepper v. First Am. Bank*, 916 F.2d 337, 341 (6th Cir. 1990)).

There is no logical reason for treating "penalty" damages under the Michigan SRCA as materially different from punitive damages under the common law or other statutes for this purpose. Indeed, other federal district courts have counted double or treble damages authorized by state statute when determining the amount in controversy. *See, e.g., Lewis v. Ford Motor Co.*, 610 F. Supp.2d 476, 485-86 (W.D. Pa. 2009) (when determining amount in controversy for purposes of federal jurisdiction, court considered treble damages potentially available under Pennsylvania

Consumer Protection Law); *Sealy, Inc. v. Mordaunt-Barrett*, 2008 WL 2704408, *2 (M.D. Fla. July 8, 2008) (noting that "the law may allow the Court to consider statutory treble damages . . . in determining the amount-in-controversy . . . .").


## LEGAL STANDARD: SUMMARY JUDGMENT

"Summary judgment is proper if the 'pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law.'" *Portinga v. Taylor*, 2009 WL 910800, *5, – F. Supp.2d –, – (W.D. Mich. Apr. 2, 2009) (Maloney, C.J.) (quoting *Patterson v. Hudson Area Schools*, 551 F.3d 438, 444 (6th Cir. 2009) (quoting FED. R. CIV. P. 56(c)); *see also Schreiber v. Philips Display Components Co.*, – F.3d –, –, 2009 WL 2840429, *6 (6th Cir. Sept. 2, 2009).[4] *Accord Alderman v. JC Dev. Communities, LLC*, 2009 WL 2607084, *1 (Mich. App. Aug. 25, 2009) (p.c.) (P.J. Owens, Servitto, Gleicher) ("Summary disposition is proper when, upon examining the pleadings, admissions and other evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.") (citing *Brown v. Brown*, 739 N.W.2d 313, 316 (Mich. 2007)).

---

[4]

Before the December 2007 amendment, FED. R. CIV. P. 56(c) stated that summary judgment is appropriate if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Appalachian Railcar Servs., Inc. v. Consumers Energy Co.*, 602 F. Supp.2d 829, 845 (W.D. Mich. 2008) (Maloney, J.) ("ARS") (quoting *Conley v. City of Findlay*, 266 F. App'x 400, 404 (6th Cir. 2008) (Griffin, J.)).

The amendment was stylistic only. *Portinga v. Taylor*, 2009 WL 910800, *5 n.9 (W.D. Mich. Apr. 2, 2009) (Maloney, C.J.) (citing *Dobrowiak v. Convenient Family Dentistry, Inc.*, 315 F. App'x 580, 584 n.4 (6th Cir. 2009) (citing FED. R. CIV. P. 56(c), Adv. Comm. Notes)).

The movant has the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law. *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial – e.g., if the movant is defending against a claim – "it may meet its burden merely by showing 'that there is an absence of evidence to support the moving party's case.'" *Moldowan v. City of Warren*, – F.3d –, –, 2009 WL 2497969, *12 (6th Cir. Aug. 18, 2009) (quoting *Celotex*, 477 U.S. at 323). *See also Wilson v. Continental Dev. Co.*, 112 F. Supp.2d 648, 654 (W.D. Mich. 1999) (Bell, J.) (movant "need not support its motion with affidavits or other materials 'negating' the opponent's claim"; rather, its initial burden is only to "point out to the district court that there is an absence of evidence to support the nonmoving party's case . . . .") (citing *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993)), *aff'd o.b.*, 234 F.3d 1271, 2000 WL 1679477 (6th Cir. 2000). *Accord Claspell v. Denso Mfg. Michigan, Inc.*, 2001 WL 1545684, *2 (Mich. App. Dec. 4, 2001) (p.c.) (P.J. O'Connell, Sawyer, Smolenski) ("That standard is exactly the same as the standard for summary disposition used under Michigan law . . . .").

Once the movant has met its burden, the non-movant must present "'significant probative evidence'" to demonstrate that there is more than "'some metaphysical doubt as to the material facts.'" *ARS*, 602 F. Supp.2d at 845 (citing *Conley*, 266 F. App'x at 404 (quoting *Moore*, 8 F.3d at 339-40)). The non-movant may not rest on the mere allegations of his pleadings. *Griffin v. Reznick*, 609 F. Supp.2d 695, 698 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, Fed. R. Civ. P. 56(e) and *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995)); *see also Transition Healthcare Assocs., Inc. v. Tri-State Health Investors, LLC*, 306 F. App'x 273, 278 (6th Cir. 2009); *accord*

*Kachudas v. Invaders Self Auto Wash, Inc.*, 2009 WL 2767303, *2 (Mich. App. Sept. 1, 2009) (p.c.) (P.J. Wilder, Cavanagh, Murray) ("When the burden of proof at trial would rest on the non-moving party, the nonmovant may not rest upon mere allegations or denials in the pleadings, but must, by documentary evidence, set forth specific facts showing that there is a genuine issue for trial.") (citing *The Healing Place at No. Oakland Ctr. v. Allstate Ins. Co.*, 744 N.W.2d 174, 177 (Mich. App. 2007) (citing, *inter alia*, *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 317 (Mich. 1996))).

If the movant puts forward evidence – such as affidavits, purported business records, purported government records, etc. – the other party cannot withstand summary judgment by simply sitting mute and failing to challenge the authenticity, admissibility, or veracity of those documents. *See, e.g., Donoho v. Smith Cty. Bd. of Ed.*, 21 F. App'x 293, 298 (6th Cir. 2001) (Boggs, J.) (affirming summary judgment for defendant employer, Circuit noted that plaintiff's "affidavit does nothing to challenge the evidence put forward by the defendants that the last IEP meeting . . . also included provision to her of the apparently usual verbal and written notices of her rights.").[5]

Moreover, the mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; there be some genuine issue of *material* fact. *ARS*, 602 F. Supp.2d at 845 (citing, *inter alia*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986))). And the non-movant "cannot defeat a properly supported motion for summary judgment motion by 'simply arguing that it relies solely or in part upon credibility determinations.'" *Heggie v. Kuzma*, 2009 WL 594908, *10 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) (quoting

---

[5]

*See, e.g., SBA v. McDonald*, 1985 WL 13600, *1 (6th Cir. Aug. 15, 1985) (p.c.) ("Even assuming the checks and money orders were mailed, there is no genuine issue as to their receipt. McDonald offers nothing to dispute the sworn affidavit that payment was not received. Payment does not occur without receipt. Summary judgment was appropriate.");

*Fogerty v. MGM Group Holdings, Inc.*, 379 F.3d 348, 353 (6th Cir. 2004) (non-movant may not "have a trial on the hope that a jury may disbelieve factually uncontested proof")).

The court must accept the non-movant's factual allegations, *ACLU v. NSA*, 493 F.3d 644, 691 (6th Cir. 2007) (concurrence) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *cert. denied*, – U.S. –, 128 S.Ct. 1334 (2008), and view the evidence in the light most favorable to the non-movant, giving it the benefit of all reasonable inferences. *Fox v. Eagle Dist. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (Griffin, J.); *see also Patterson*, 551 F.3d at 445.[6]

But the court considers its evidence only to the extent that it would be admissible at trial. *ARS*, 602 F. Supp.2d at 845 (citing *Healing Place*, 744 N.W.2d at 177 (citing MICH. CT. R. 2.116(G)(6) and *Veenstra v. Washtenaw Country Club*, 645 N.W.2d 643, 648 (Mich. 2002))).

Ultimately, entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party w[ould] bear the burden of proof at trial." *Davison v. Cole Sewell Corp.*, 231 F. App'x 444, 447 (6th Cir. 2007) (quoting *Celotex*, 477 U.S. at 322).[7] "As Chief Judge Bell has characterized the

---

[6]

*Accord Denha v. Dart Props., Inc.*, 2009 WL 30459, *1 (Mich. App. Jan. 6, 2009) (p.c.) (P.J. Zahra, JJ. O'Connell & Fort Hood) (citing *Walsh v. Taylor*, 689 N.W.2d 506, 511 (Mich. App. 2004) (citing *Spiek v. MDOT*, 572 N.W.2d 201 (Mich. 1998))).

[7]

A trilogy of 1986 Supreme Court decisions "made clear that, contrary to some prior precedent, the use of summary judgment is not only permitted but encouraged in certain circumstances . . . ." *Collins v. Assoc'd Pathologists, Ltd.*, 844 F.2d 473, 475-76 (7th Cir. 1988). *Accord In re Fin. Federated Title & Trust, Inc.*, 347 F.3d 880 (11th Cir. 2003) (the trilogy "encourage the use of summary judgment as a means to dispose of factually unsupported claims.");

*Hurst v. Union Pacific Rail Co.*, 1991 WL 329588, *1 (W.D. Okla. 1991) ("This trilogy of cases establishes that factual and credibility conflicts are not necessarily enough to preclude summary judgment and encourage that a summary judgment be used to pierce the pleadings and determine if there is in actuality a genuine triable issue."), *aff'd*, 958 F.2d 1002 (10th Cir. 1992);

post-trilogy summary-judgment standard, '[w]hile preserving the constitutional right of civil litigants to a trial on meritorious claims, the courts are now vigilant to weed out fanciful, malicious, and unsupported claims before trial.'" *Ellis v. Kaye-Kibbey*, 581 F. Supp.2d 861, 874 (W.D. Mich. 2008) (Maloney, C.J.) (quoting *Wilson*, 112 F. Supp.2d at 654).

## DISCUSSION
## Count 1, Breach of Contract

In pertinent part, Triton makes the following argument with regard to breach of the oral agreement, which King fails to rebut with any arguably sound reasoning or with any competent documentary or testimonial evidence:

> It will not be disputed that when King became an ISR for Triton, he was paid commissions for orders of boats which were previously in process prior to him becoming an ISR for Triton. Exhibit E, King Dep., p. 22; Exhibit C, Siefker Dep., p. 27. Commission became due and payable on these orders when the boats were shipped and the dealer, within the Territory, paid for the boats. Exhibit D, Van Wagenen Dep, p. 34. Again, this reflects Triton's policy that it pays new ISR's [sic] commissions generated from orders occurring prior to the ISR's affiliation with Triton in order to provide the ISR with a stream of income until he or she begins generating commissions based on their own efforts.

> As an example, King admitted that he received commissions of two percent (2%) for orders placed with four established Triton dealers which were in process when King became an ISR with Triton. These dealers are Mitchell Marine, Bay Marine, Harbor Light and High Rock. Exhibit E, King Dep., pp 18, 20[,] 21. King admitted under oath that loads of pontoon boats that were shipped under orders that were placed and filled prior to King becoming an ISR for Triton gained him a two percent (2%) commission. *Id.* [Exhibit E, King Dep.], p. 22.

> [footnote 4] In his deposition, King contended that he did not pay any attention to the commission statements provided to him by Triton because he is not a "bean counter."

---

*Bowser v. McDonald's Corp.*, 715 F. Supp. 839, 840 (S.D. Tex. 1989) (the trilogy "encouraged federal district courts to use summary judgment more frequently and economically by changing the movant's burden of production . . . and by allowing qualitative review of evidence").

King further testified that he had no knowledge of receiving a check before he opened his first orders. Exhibit E, King Dep., p. 22. Apparently, King thought that Triton was gratuitously sending him commission checks in the Summer of 2004 [he began work as a Triton ISR in May 2004] since he had not placed any orders for Triton at that time. Exhibit B, Van Wagenen Affidavit, ¶ 15.

There will also be no dispute that King's successor in the Territory, Keith Fishburn, was also a beneficiary of Triton Commission Policy. Fishburn was paid for orders in process prior to Fishburn becoming an ISR of Triton. Exhibit B, Van Wagenen Affidavit, ¶[¶] 13-15; Exhibits F, G and I (Information Form, Order Acknowledgement and Invoice).

It is anticipated that King will simply deny that he ever agreed to the Triton Commission Policy. King's Interrogatory Response simply contends:

> Plaintiff states that the orders received by Defendant upon which commissions were payable to Plaintiff during the term of Plaintiff's sales representation includes any and all orders received from customers or accounts located in Plaintiff's assigned territory during the term of the relationship between Plaintiff and Defendant, regardless of when those orders were shipped or paid for, regardless of whether the order was written by Plaintiff or by some other person, and regardless of whether such orders were later replaced by a new order with a later date.

Exhibit J, King's Answer to Triton's First Set of Interrogatories, Interrogatory No. 7.

The basis for this claim is simply King's faulty recollection while responding to Triton's Interrogatories. *King cannot produce any credible [sic, competent?] evidence to corroborate his faulty Interrogatory [answer] recollection. [On the contrary], at his deposition King testified that he had no recollection during his tenure as an ISR with Triton of receiving commission for a boat that was not delivered to and paid for by a dealer.* Exhibit E, King Dep., p. 31.

King also claims he is entitled to Post-Termination Commissions based upon Information Forms obtained from dealers at the 2006 Dealer Meeting. In other [words], King will argue that Summer 2006 dealer meeting forms (such as Exhibit F) are mature, commission-payable invoices (such as Exhibit H). However, it is undisputed that the Information Forms do not impose any legal obligation on a dealer to actual[ly] buy a pontoon boat from Triton. This is also reflected in the Information form Order Acknowledgement and Invoice at Exhibits F, G and H. King demonstrated in his testimony that he fully understood this situation. He testified as follows:

| | |
|---|---|
| Q. | Do you know whether the dealers, when they placed their orders at the dealer meeting, had the option of not following through and purchasing those boats? |
| A. | Well, I am sure [Triton CEO] Scott [Van Wagenen] didn't hold a gun to their head and say, ["]You have got to do this, but if they wanted their discount and didn't want to relinquish their discount, they did.["] |
| Q. | What did you understand, if at all [about] the process, as far as starting with the dealer meeting, through to the delivery of a boat, meaning as far as constructing the boat, was the dealer then required to provide additional documentation for the boat? |
| A. | Well, in the first place the boat hasn't been built so the dealer doesn't have any documentation for the boat. |
| Q. | Is there any invoice for the boat at that time? |
| A. | Not until – you are getting into an area that I wasn't really involved in. |

Exhibit E, King Dep, p. 30. [King] also had no recollection of ever receiving a commission for a boat that was never delivered. *Id.*, p. 31.

Further, *King acknowledged in his deposition that the "ordering" of boats at the Dealer Meeting does not mean that they get built or bought.* Id.*, pp.* 29, 30. * * *

[In] contrast [to] King's legal position . . . [that] he was entitled to commission regardless of when the boat was paid for, King admitted at his deposition [that] he would only receive a commission "[a]s they (the boats) were built and delivered and the money was collected." Exhibit E, King Dep., p. 31. * * * *King will be unable to come forward with any Summer 2006 Dealer Meeting[] Information Form that matured into a commission-payable sales [sic] during his tenure, despite unfettered access to all of Triton's documents.*

Further, [i]t is undisputed that upon King's termination in September, 2006, there were no "orders" in process which would entitle him to a commission during the Post-Termination Period, even assuming the Triton Commission Policy did not exist. Exhibit B, Van Wagenen Affidavit, ¶ 17. Again, the Information Form obtained at the 2006 Dealer Meeting generally described the pontoon boats in which [sic] the dealers have expressed an interest in purchasing. Exhibit F [Information Form]. The exact specifications for the manufacture of a specific pontoon boat are set forth in the

-14-

sale Order Acknowledgement. Exhibit G. Months later – assuming there is approval of the dealer's financing to purchase the pontoon boat – an invoice is prepared and the boat is delivered to the dealer. Upon payment by the dealer (and providing that there are no repossessions), the ISR earns or accrues their commission. See generally, Exhibit B, Van Wagenen Affidavit.

* * *

Further, King will be unable to come forth with any evidence to rebut Triton's position that no commissions have ever been paid to an ISR, including King, for a boat that was not delivered to a dealer and paid for. Exhibit B, Van Wagenen Affidavit, ¶ 16.

In sum, there is no evidence to support King's position that he was entitled to post-termination Commissions in contravention of Triton's Commission Policy. Likewise, there are no facts to support King's claim that there were "orders" in existence on September 26, 2006 [the date he was terminated] for which he would subsequently be entitled to a commission, even if the Triton Commission Policy were not in place [i.e., were not part of the parties' oral agreement].

MSJ at 11-16 (paragraph breaks added, emphasis added).

King responds that Triton Sales Manager Siefker testified that Triton

generally did not pay any commissions to a new sales representative on orders received from existing dealers in the new representative's assigned territory. *See* Ex B, Siefker Dep., pp. 25-26. Mr. Siefker testified that the agreement to pay Mr. King a reduced 2% commission relative to certain existing dealers was "a special deal." See Exhibit B, Siefker Dep., p. 26. Mr. King also testified that he was only paid the reduced 2% commissions on sales to certain dealers located in his territory, and not on all sales to all dealers in his territory. See Exhibit A, King Dep., pp. 21-22. The parties have clearly presented conflicting evidence as to whether Triton had a policy of paying commissions to its sales representatives for all sales to dealers in the sales representatives' assigned territory, but only for such sales made during the term of the sales representative's relationship with Triton.

It is also important to note that there is no evidence that Mr. King ever expressly agreed to forgo sales commissions on orders he procured prior to his termination but for which the boat or motor was shipped, invoiced and paid for after his termination. Mr. Siefker, who made the agreement with Mr. King, did not identify any such term when he was asked about the agreement during his deposition. And Mr. King never agreed to any policy or contract provision limiting or eliminating the commissions he earned in the event of termination. See Exhibit F, Declaration of James W. King [no paragraph or page number provided]. Although Triton claims it had a policy of not paying post-termination commissions to its sales representatives, it has not presented any evidence that this alleged policy was ever communicated to Mr. King

or that Mr. King ever agreed to it.

> A genuine issue of material fact is clearly present with regard to the terms of the oral agreement between the parties. Triton has submitted an affidavit indicating that it had a policy of both paying commissions to new sales representatives on orders they had not procured, and of not paying post-termination commissions to sales representatives on orders they had procured. [No citation to record] Triton's own Sales Manager, Michael Siefker, testified during his deposition that this was not a Triton policy [no citation to record]. Furthermore, Mr. King's own declaration indicates that he was never made aware of any such policy, and he never agreed to any such policy. [No citation to record] Under the circumstances, a question of fact is clearly present which should be resolved by the jury. Accordingly, Triton's Motion for Summary Judgment should be denied without regard to Count I.

P's Opp at 10-12.

The requirements and general Michigan common law governing oral contracts is the same as those governing written contracts. *See Warnes v. Brubaker*, 65 N.W. 276, 277, 107 Mich. 440, 443 (Mich. 1897) ("The case arising upon a written contract is not different from one growing out of a valid oral agreement.").

"To establish a breach of contract, a plaintiff must establish both the elements of a contract and a breach of the contract." *Slomka v. City of Hamtramck Hsg. Comm'n*, 2009 WL 1066918, *1 (Mich. App. Apr. 21, 2009) (p.c.) (P.J. Markey, Fitzgerald, Gleicher) (citing *Pawlak v. Redox Corp.*, 453 N.W.2d 304, 307, 182 Mich. App. 758, 765 (Mich. App. 1990)). A valid contract requires (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. *See Thomas v. Leja*, 468 N.W.2d 58, 60, 187 Mich. App. 418, 422 (Mich. App. 1991) (citing *Detroit Trust Co. v. Struggles*, 286 N.W. 844, 289 Mich. 595 (Mich. 1939)). It is undisputed that King and Triton satisfied these five criteria at least as to some issues, and neither party has contended that their oral agreement was not a valid enforceable contract.

The parties disagree, however, over whether their oral contract included Triton's alleged policy regarding the payment of post-termination commissions. Triton alleges that the oral contract included its longstanding practice of paying commissions only to the sales representative currently assigned to the territory, without regard to whether that representative played any role in procuring or negotiating the sale. King alleges that Triton never communicated that policy to him, and thus that he never agreed to it.

Under the circumstances, such conflicting recollections or interpretations of what was orally agreed regarding post-termination commissions allows a reasonable factfinder to conclude either that (1) King's version is truthful and accurate, such that the oral agreement expressly contractually entitles him to receive post-termination commissions for sales which he played a hand in obtaining but for which the customer did not pay until after his termination or (2) Triton's version is truthful and accurate, i.e., the oral agreement expressly forecloses any contractual right to receive such post-termination commissions. It would be the jury's domain to decide which of the parties (if any) is lying, and/or which of the parties (if any) is honestly giving a mistaken recollection of what they orally agreed. Such a determination rests on an evaluation of each witness or declarant's credibility and reliability, and in Michigan, "'[t]he court is not permitted to assess credibility, or to determine facts on a motion for summary judgment.'" *White v. Taylor Dist. Co., Inc.*, 739 N.W.2d 132, 138, 275 Mich. App. 615 (Mich. App. 2007) (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 516 N.W.2d 475, 480 (Mich. 1994)). *See, e.g.,* applying Michigan law, *State Farm Fire & Cas. Co. v. Liberty Ins. Underwriters, Inc.*, 613 F. Supp.2d 945, 948 n.1 (W.D. Mich. 2009) (Paul L. Maloney, C.J.) (company executive's testimony as to whether he was acting within the scope of his duties when he took a particular automobile trip, which determined whether an insurance carrier was

-17-

obligated to provide coverage for a loss sustained on that trip, was not susceptible to resolution by the court on summary judgment, even if the carrier had not expressly challenged his "credibility or suggest[ed] any incentive on his part to fabricate his testimony") (citations omitted); *accord Coburn v. Rockwell Automation*, 238 F. App'x 112, 126 (6th Cir. 2007) (Richard Allen Griffin, J.) ("This boils down to a credibility determination, the very type of determination that courts may not resolve on summary judgment.").

The Michigan appellate courts have long applied this principle in disputes over the content of oral contracts, including an oral sales-representative contract. *See Ferries v. Copco Steel & Eng'g Co.*, 73 N.W.2d 850, 344 Mich. 345 (Mich. 1955) (in action by salesman against employer to recover commissions, wherein employer alleged that parties had terminated oral agreement and entered into a new oral agreement, and salesman alleged that the original oral agreement was still in force, "[q]uestions of fact for the determination of the jury were presented."); *Buck v. Staffney*, 1999 WL 33455079, *2 (Mich. App. Jan. 26, 1999) (p.c.) (P.J. Hood, Neff, Markey) ("Last, defendant claims that there was an oral agreement to close at a time different from that specified in the purchase agreement; however there was also testimony that contradicted defendant's claims. Questions involving credibility should be left for the trier of fact to resolve."); *cf. Mahoney v. Lincoln Brick Co.*, 8 N.W.2d 883, 885, 888, 304 Mich. 694, 699, 707-708 (Mich. 1943) ("Mr. Kruer, the president of defendant company, presented an entirely different version of the oral contract in question. * * * [The factfinder] is the judge of . . . the credibility of the witnesses; unless the findings are against the preponderance of the evidence, the judgment is not disturbed on appeal.").

Alternately, this record would permit a reasonable jury to find that neither party's asserted recollection is correct. Namely, the jury could find that the parties never discussed the matter of

post-termination commissions, or that they discussed the matter but gave up when they were unable to reach agreement. In either case, the jury would reasonably find that the oral agreement was silent as to the existence and extent of King's right to receive post-termination commissions.

Nonetheless, Triton is still entitled to summary judgment on the breach of contract claim, because King has not shown a genuine issue as to whether he was entitled to commissions for the orders in question *even under his own version of the parties' oral agreement*. According to King himself, the parties' oral agreement entitled him to payment of a commission only if and when the customer paid Triton for the boat. As to the orders listed in King's amended damages computation, doc. no. 44, King has failed to present *any* evidence that customers actually paid Triton. Thus, he has failed to present evidence which would permit a factfinder to conclude that the condition-precedent to payment of a commission (according to his own statement of the oral agreement) was satisfied. Consequently, Triton is entitled to summary judgment on count one, breach of contract.

## DISCUSSION
### Count 2, Procuring-Cause Doctrine

In count two, King invokes Michigan's common-law procuring-cause doctrine, which "applies only when there is no express contract[ual provision] governing post-termination commissions." *Schupra v. Wayne Oakland Agency*, 2008 WL 2152662, *5 (Mich. App. May 22, 2008) (p.c.) (P.J. Owens, Meter, Schuette) (citing *Clark Bros. Sales Co. v. Dana Corp.*, 77 F. Supp.2d 837, 848-49 (E.D. Mich. 1999) (interpreting *Reed v. Kurdziel*, 89 N.W.2d 479, 352 Mich. 287 (Mich. 1958))). *Accord Jack Peddie & Assocs., Inc. v. Whitmor Mfg. Co.*, 1992 WL 355475, *4-5 (6th Cir. Dec. 2, 1992) (holding that Michigan's procuring-cause doctrine applies where "the issue of post-termination commissions was undecided at the time the contract was executed").

The procuring-cause doctrine provides that

> the agent is entitled to recover his commission whether or not he has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale. In Michigan the rule goes further to provide [that] if the authority of the agent has been cancelled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause.

*Reed v. Kurdziel*, 89 N.W.2d 479, 352 Mich. 287, 295 (Mich. 1958) (citations omitted). King relies on *Leger v. Image Data Servs.*, No. 221615, 2002 WL 1463555 (Mich. App. July 5, 2002) (p.c.) (P.J. Fitzgerald, Bandstra, K.F. Kelly), which defines procuring cause as "'the cause originating a series of events, which, without a break in their continuity, result in the accomplishment of the prime object.'" *Id.* at *1 (quoting Black's Law Dictionary 1208 (5th ed. 1990)).

The same unpublished Michigan Court of Appeals decision holds that a sales representative "'will be regarded as the procuring cause of a sale, so as to be entitled to commission, if his or her efforts are the foundation on which the negotiations resulting in a sale are begun.'" *Leger*, 2002 WL 1463555 at *1 (quoting Black's Law Dictionary 1208 (5th ed. 1990)). Put another way, "[a]lthough what constitutes a procuring cause is not defined with precision by Michigan case law, a procuring cause has been defined as the 'chief means, by which [a] sale was finally effected.'" *Buchanan Co. v. Methode Electronics, Inc.*, 2001 WL 1219407, *2 (Mich. App. Oct. 12, 2001) (p.c.) (P.J. Collins, Murphy, Jansen) (quoting *Kinsey v. Barth*, 158 N.W.2d 872, 192 Mich. 219, 223 (Mich. 1916)), *app. denied* 672 N.W.2d 856, 467 Mich. 879 (Mich. Sept. 30, 2002), *recon. denied*, 655 N.W.2d 558, 467 Mich. 879 (Mich. Dec. 4, 2002).

Combining this definition with the principle that "[t]he question whether the plaintiff was the procuring cause of the sales" is one of fact, not of law, *see Kelso v. Woodruff*, 50 N.W. 249, 88 Mich. 299, 303 (Mich. 1891), King concludes that summary judgment is inappropriate on his

procuring-cause claim. The *Leger* panel went on to say, per the Michigan Supreme Court, that because the relationship between the principal and the sales representative is a contractual one, whether the representative "is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered." *Leger*, 2002 WL 1463555 at *2 (citing *Reed*, 352 Mich. at 294, 89 N.W.2d 479) (quoting 12 A.L.R.2d 1360, 1363)).

In considering the circumstances surrounding King's work as a sales representative on behalf of Triton, the court adopts Triton's statement – emphasized at oral argument – that the forms filled out at the 2006 annual boat-dealer meeting (shortly before King's termination) did not impose any legal obligation on the dealers to buy the boats described. King testified at deposition that these forms almost invariably led to an eventual sale and payment, and neither party has presented evidence regarding the percentage of such forms which led to the purchase of a boat.[8] But King has never claimed that the forms constituted a contract or imposed a legal obligation to purchase. Accordingly, even if the court treated an annual-meeting form as a dealer's expression of strong

---

[8]

Under Michigan law, King's procuring-cause claim would not be defeated by proof that after receiving a form as a result of his efforts, Triton officials negotiated terms different from or in addition to those suggested by the form's description of the tentatively-desired boat. For example, Michigan law would not automatically foreclose King's procuring-cause claim if the dealer later negotiated a lower price, or requested different options or features, after King's involvement in the process ended. As venerable Michigan Supreme Court precedent holds, "'If a broker has brought the parties together and as a result they conclude a contract, he is not deprived of his right to a commission by the fact that the contract so concluded differs in terms from the one which he was authorized to negotiate.'" *Petroff v. Grand Blank Tractor Sales, Inc.*, 2009 WL 3757434, *3 (Mich. App. Nov. 10, 2009) (p.c.) (P.J. Stephens, Cavanagh, Owens) (quoting *Friedenwald v. Welch*, 140 N.W. 564, 565, 174 Mich. 399, 401 (Mich. 1913) (citing, *inter alia*, *Prindle v. Allen*, 164 Mich. 553, 129 Mich. 695 (Mich. 1911))).

interest in a particular model boat – and assumed *arguendo* that King was solely responsible for persuading the dealers to submit such a form – the existence of such a form alone would not constitute proof that the dealer ever bought and paid for a boat as a result of that persuasion.

In this vein, King's procuring-cause claim fails simply for lack of proof. Triton cogently explains what King has failed to show on this score, in light of the qualifications to the procuring-cause doctrine:

> The Plaintiff's Brief, at best, contains various bald and unsupported statements to the effect that he should have earned substantial commissions based on the late-Summer 2006 Triton [boat-]dealer meeting. Pl.'s Brief, p. 6.
>
> However, Plaintiff fails to identify or attach a single "procured" order and fails to track any so-called order through the otherwise undisputed finalization process. There is no evidence of whether a dealer[-]meeting boat was ever built; whether the unidentified boat underwent substantial changes before it was built; whether financing was ever obtained; when that financing was obtained; or whether the unidentified financing was actually paid for and not repossessed.
>
> *By Plaintiff's own admission, dealer payment is the event that activates the entitlement to commission payment.* * * * Exhibit E, King Dep., . . . p. 31 (King could not recall ever receiving commission payment for any boat that was not actually built, shipped and paid for, and could not recall any Rep [sic] receiving such commissions from Triton)); *id.*, p. 31 (King only received commissions on boats "as they were built and delivered and the money was collected"), *id.*, p. 35 (King could not show that he earned commission if a dealer never took a dealer[-] meeting boat).
>
> * * *
>
> As the authorities plaintiff cites and attached to his brief make clear, if there is a break in negotiations for a sale, and the sale is "concluded by the principal without the aid of its broker, the broker may be denied any commissions." 12 Am. Jur.2d Brokers § 237. Further, a broker is not a procuring cause "especially where the customer already knew about the opportunity and had decided to negotiate with the principal." *Id.*[9] An early procuring cause case dealing with goods noted "enough

---

[9]

Indeed, Triton stated at oral argument, without contradiction from King, that many of the alleged paid sales for which he seeks post-termination commissions were sales to four dealers who already were aware of Triton and were established customers in that geographical territory before he became a Triton ISR. Triton can logically urge the inference that the dealers would have bought the boats which they bought even without King's presence and efforts. *See Petroff*, 2009 WL

evidence in the case to submit the question to the jury," and cited the plaintiff's activities in initiating the sale at issue, along with correspondence in support. *Case v. Rudolph Wurlitzer Co.*, 186 Mich. 81, 85, 151 N.W. 977 (1915).

> *Here, Plaintiff provides no facts – let alone admissible documents, affidavits, or deposition testimony – showing that he "procured" any particular sale, or identifying the sale allegedly procured. Plaintiff has not provided any documents supporting such claims, or documents showing that there was not a long delay between his employment and a finalized sale,* 12 AM. JUR. 2D BROKERS, § 237, or that dealers at a summer 2006 dealer meeting did not already know about Triton and did not already intend to negotiate with Triton irrespective of King's efforts. King's unsupported procuring cause claim therefore fails, as it does not identify any sales and does not identify any actions to procure those alleged sales.

Def's Reply at 8-10 (emphasis and some paragraph breaks added).

Indeed, the Michigan Court of Appeals has required that an SRCA plaintiff present evidence specific to each sale; it is not sufficient to allege that the representative worked or negotiated with the particular customer on other matters or was the procuring cause of other sales from that same customer. *See Steinke & Assocs., Inc. v. Loudon Steel, Inc.*, 2006 WL 664346 (Mich. App. Mar. 16, 2006) (p.c.) (P.J. Murray, Cavanagh, Saad) (representative which terminated its relationship with manufacturer and subsequently was paid for two sales that had been completed prior to termination was not entitled to commissions for additional sales finalized after termination, even though such post-termination sales referenced pre-termination sales for which it had received commissions, because representative failed to show that it performed work with respect to those particular sales); *cf. Active Marketing, Inc. v. SKF USA, Inc.*, 2005 WL 3556108, *2 (Mich. App. Dec. 29, 2005) (p.c.) (P.J. Owens, Saad, Fort Hood) (affirming summary disposition for principal on sales

_____

3757434 at *5 ("Plaintiff argues that the parties never would have made an agreement [to buy backhoes] had he not brought them together. However, since defendants already knew about [Bulgarian company] Hydro before plaintiff went overseas, they might be able to prove that plaintiff contributed little to the effort, and that the second translator did all the real work.").

representative's procuring-cause claim for post-termination commissions on sale of automotive parts) (sales representative received post-termination commissions on certain orders, but did not show a genuine issue of entitlement to commissions on same customers' later *re*orders of those same parts; "Plaintiff's deposition statements do not provide any specific facts supporting its assertion that no follow-up service is necessary on certain reorders. While deposition statements could qualify under the rules for showing a genuine issue, the statements relied upon by plaintiff are in essence nothing more than a promise to show substantive admissible evidence at trial concerning the efforts actually utilized to obtain reorders. Such statements, without specific supporting facts, are not sufficient to create a genuine issue of material fact.").[10]

Accordingly, Michigan's procuring-cause doctrine is of no avail to King given his failure to muster evidence from the record to permit the finding that he was the procuring cause of any particular sale *for which a customer paid* Triton after his termination. Summary judgment must be granted to Triton on count two as well.

### DISCUSSION:  Count 3, Michigan Sales Representative Commission Act

In pertinent part, the Sales Representative Commission Act ("SRCA") provides that

[a]ll commissions that are due at the time of termination of a contract between a sales

---

[10]

*See also Fernandez v. Powerquest Boats, Inc.*, 798 F. Supp. 458 (W.D. Mich. 1992) (McKeague, J.) (holding that sales representative was not entitled to post-termination commissions for sale of power-boats under Michigan law, because the parties' oral agreement was silent on the issue and he failed to present specific evidence that he was the procuring cause of those sales).

*Accord Arsham v. Banci*, 511 F.2d 1108 (6th Cir. 1975) (applying New York law) (under oral agreement providing that plaintiff would receive commissions for fabric orders obtained as a result of his efforts, he was not entitled to commission where there was evidence that clothing manufacturer did not purchase fabrics at meeting arranged by plaintiff, that fabric manufacturer received order from clothing manufacturer only after re-designing its product line, introducing a new fiber, and arranging a showing with different personnel present).

representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date on which the commission became due.

MICH. COMP. LAWS § 2961(4).

If the parties' oral agreement incorporated the Triton Commission policy as described by Triton (as Triton alleges), then King's SRCA claim would fail, because that Policy provides that an ISR is not entitled to a commission until and unless a boat dealer in his geographical territory finalizes and pays for an order while he is employed as an ISR.

If, on the other hand, the parties' oral agreement did <u>not</u> include the Triton Commission policy as described by Triton (as King alleges), then the parties' oral agreement would not answer the question of under what circumstances an ISR was entitled to post-termination commissions for sales which he procured but which were not finalized and/or paid for until after his termination. Such a case would be governed by MICH. COMP. LAWS § 2961(3), which provides that

> [i]f the time when the commission is due cannot be determined by a contract between the principal and the sales representative, the past practices between the parties shall control or, if there are no past practices, the custom and usage prevalent in this state for the business that is the subject of the relationship between the parties [shall control the question of if and when the commission is due].

Triton presents uncontroverted evidence that (1) when King started working as an ISR, he was paid commissions on sales which his predecessor procured but which were not finalized and paid for until he took over as ISR; and (2) when King's successor started working as an ISR, the successor likewise was paid commissions on sales which King arguably had a hand in developing but which were not finalized and paid for until the successor took over as ISR, *see* MSJ Ex B (Van Wagenen Aff) ¶¶ 13 and 15 (discussing commissions paid to successor Keith Fishburn). Conversely, King's briefs attach or identify no evidence whatsoever that Triton otherwise ever paid him, his predecessor

in the territory, his successor in the territory, or any other ISR, commissions for an order which was not finalized and paid for while that ISR was serving as ISR for the given territory.

Thus, King has shown no genuine issue as to whether the parties' "past practices" (MICH. COMP. LAWS § 2961(3)) entailed the payment of the type of post-termination commissions which he seeks. Any reasonable factfinder would be compelled to conclude that Triton and King's past practices did *not* include or contemplate that such commissions be paid to him. Past practice dictated that such commissions would be paid to King's successor, even though the successor did not "generate" or procure the underlying sales, just as King was paid commissions on sales which he admittedly did nothing to procure (because he was not yet an ISR when those sales were negotiated and procured).

In other words, King's SRCA claim fails because he has shown no genuine issue as to whether Triton even owed him post-termination commissions, the first element of such a claim. *See* MSJ at 17-19; P's Opp at 15-16. *A fortiori*, King cannot show a genuine issue as to whether Triton *intentionally* failed to pay such commissions within the requisite period. *See* MSJ at 19-20; P's Opp at 15-16 (citing *Kenneth Henes Special Projects v. Continental Biomass Indus., Inc.*, 659 N.W.2d 597, 468 Mich. 109, 114 (Mich. 2003) for proposition that principal's good-faith belief that commissions were not due are irrelevant to whether principal "intentionally failed" to pay those commissions for purposes of Mich. Comp. Laws § 600.2961(5)(b)'s double-damages provision, and *id.*, 468 Mich. at 118 for proposition that "the only cognizable defense to a double-damages claim is if the failure to pay the commission were based on inadvertence or oversight"). Triton is entitled to summary judgment on count three as well.

Finally, as the prevailing party on the SRCA claim, Triton is entitled under that statute to an

award of attorney's fees and costs. *See* MICH. COMP. LAWS § 2961(6) ("If a sales representative brings a cause of action pursuant to this section, the court shall award to the prevailing party reasonable attorney fees and court costs."); MICH. COMP. LAWS § 2961(1)(c) (defining prevailing party for purposes of the SRCA as "a party who wins on all the allegations of the complaint or on all of the responses to the complaint"[11]).

Such an award is mandatory in an SRCA action, *see Dworman v. Auto Club Ins. Ass'n*, No. 259539, 2006 WL 889983, *2 (Mich. App. Apr. 6, 2006) (p.c.) (P.J. Smolenski, Owens, Donofrio) (citing *Peters v. Gunnell, Inc.*, 655 N.W.2d 582, 590 n.10, 253 Mich. App. 224 n.10 (Mich. App. 2002)), and it inures to the benefit of defendant-principals as well as sales representatives, *see, e.g., Shaw v. MRO Software, Inc.*, 2006 WL 3084561, *6 (E.D. Mich. Oct. 27, 2006) (Sean F. Cox, J.) ("Accordingly, because it is the prevailing party on Plaintiff's MSRA claim, Defendant is entitled to reasonable attorney fees and court costs."). This award serves the purpose of "encourag[ing] parties not to assert implausible legal theories or allege questionable facts." *Schlesinger v. Customized Transp., Inc.*, 2000 WL 1279162, *5 (E.D. Mich. Aug. 28, 2000) (Borman, J.) (citing Saylor & Acomb, "Michigan Sales Representative Statute," 73 MICH. BAR J. 208, 209 (Feb. 1994)).

## ORDER

---

[11]
Although MICH. COMP. LAWS § 2961(6) literally requires a party to win on all portions of the complaint, the Michigan courts interpret it, sensibly, to require only that the party win on the SRCA claim itself. *See Michigan Technical Representatives, Inc. v. Mold-Ex, Inc.*, 2008 WL 344524, *1 (E.D. Mich. Feb. 6, 2008) (Denise Page Hood, J.) ("To receive reasonable attorney fees under MICH. COMP. LAWS § 2961(6), a plaintiff need only prevail on his intentional failure to pay commissions claim and does not need to prevail on other alternative theories of liability.") (citing *Kenneth Henes Special Projects Procurement v. Continental Biomass Indus., Inc.*, 86 F. Supp.2d 721, 736 (E.D. Mich. 2000) (citing *H.J. Tucker & Assocs. v. Allied Chucker & Eng'g Co.*, 595 N.W.2d 176, 182, 234 Mich. App. 550, 560-61 (Mich. App. 1999))).

Defendant's motion for summary judgment [# 30] is **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1)(A), defendant's entitlement to attorney fees and costs under the Michigan Sales Representative Commissions Act, and the quantification of same, are **REFERRED** to United States Magistrate Judge Joseph G. Scoville for determination.

This is not a final and immediately-appealable order.

**IT IS SO ORDERED** on this 2nd day of December 2009.


/s/ Paul L. Maloney
Honorable  Paul L. Maloney
Chief United States District Judge